

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**JANE DOE**
c/o Kevin E. Byrnes
Schnader Harrison Segal & Lewis LLP
750 Ninth Street, NW, Suite 550
Washington, DC 20001

*Plaintiff,*

v.

**DR. ROBERT M. GATES**, in his official capacity,
Secretary of Defense,
United States Department of Defense
1400 Defense Pentagon
Washington DC 20301-1400

*Defendant.*

Case: 1:09-cv-02349
Assigned To : Leon, Richard J.
Assign. Date : 12/10/2009
Description: Civil Rights-Non-Employ.

**COMPLAINT**

Plaintiff Jane Doe,[1] by counsel, hereby alleges unlawful disability discrimination under the Rehabilitation Act of 1973, as amended, against her federal employer, and seeks related declaratory, mandamus, and injunctive relief, as described more fully below.

**Jurisdiction and Venue**

1. Jurisdiction: This Court has subject-matter jurisdiction over the claims raised herein under the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 701 *et seq*., plaintiff having exhausted all available administrative remedies prior to the filing of this Complaint. *See*

[1] "Jane Doe" is a pseudonym.

3

*also* 28 U.S.C. § 1331 (federal question); 5 U.S.C. § 701 *et seq.* (Administrative Procedure Act). Plaintiff also seeks relief under 28 U.S.C. § 1361 (mandamus); 28 U.S.C. §§ 2201, 2201 (declaratory and further relief); and 28 U.S.C. § 1343 (redress of civil rights), which provide additional bases for this Court's jurisdiction over this action.

2. Venue: Venue lies pursuant to the Rehabilitation Act and is governed by the special venue provisions of Title VII of the Civil Rights Act of 1964, as amended, which provides that venue is proper "in any judicial district in the state in which the unlawful employment practice is alleged to have occurred." 42 U.S.C. § 2000e-5(f)(3). With respect to Plaintiff's related claims for mandamus, declaratory and further relief, and redress of civil rights, venue is proper where "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(e)(2). In this case, the actions and decisions that form the basis of this Complaint occurred in Washington, DC, while Plaintiff was employed there. Venue over all claims is therefore proper in the District of Columbia.

**Parties**

3. Plaintiff: Ms. Jane Doe (Plaintiff or "Ms. Doe") is a civilian employee of the Defense Intelligence Agency, a part of the U.S. Department of Defense. Ms. Doe is a resident of Virginia.

4. Defendant: Dr. Robert M. Gates as Secretary of Defense of the United States Department of Defense ("DOD"), a component of the Executive Branch of the United States Government, must be named as a party. Plaintiff's employer, the Defense Intelligence Agency ("DIA"), is a combat support agency that is organizationally part the DOD. United States Central Command ("CENTCOM"), also implicated in this action, is a theater-level Unified

Combatant Command unit that is also part of the DOD and thus part of the same federal agency. As Secretary, Dr. Gates is responsible for the actions, omissions, and practices of the DOD, DIA, and CENTCOM. Secretary Gates is sued in his official capacity as the head of DOD. Further, as this complaint attacks the application of what is believed to be an unlawful policy, the Secretary of Defense is the appropriate party in interest.

**Statement of Facts**

5. Ms. Doe is a civilian employee of the DIA. At the time of the discrimination alleged, Ms. Doe was employed as a researcher and writer for the DIA in the District of Columbia. She has since been promoted and now works out of the Pentagon, in Alexandria, Virginia.

6. There is no question that Ms. Doe is qualified to perform the essential functions of her job. She has been performing them at high levels of competence. Her position also involves the use and analysis of complicated national security information and is buttressed by a security clearance process and level that bespeaks of her integrity and abilities.

7. On or about 2003, while employed by the DIA, Ms. Doe was diagnosed with bipolar affective mood disorder.

8. Bipolar mood disorder is a well-recognized and treatable mental impairment that affects millions of Americans in all walks of life and professions.

9. As a result of Ms. Doe's diagnosis of bipolar disorder, Ms. Doe has had, does have, and/or is perceived as having, a mental impairment that substantially affects her major life activities and which limits her ability to work, concentrate, and/or communicate with others.

10. The DIA has had actual notice of Ms. Doe's diagnosis and treatment plan since 2003.

11. On or about 2004, in response to notice of her diagnosis, the DIA conducted the equivalent of a fitness for duty assessment by reviewing medical information and making an individual assessment of Ms. Doe's condition and its impact on her ability to perform the substantial and essential functions of her position. The DIA determined that Ms. Doe's diagnosis was not a disqualifying impediment to Ms. Doe's employment or clearance level.

12. Based on her diagnosis and its investigation, the DIA has required only that Ms. Doe comply with medical advice; continue any treatment deemed necessary by her doctor; and notify DIA Security if there should be any changes in her diagnosis, medication, or the identity of her treating physician.

13. In other words, DIA determined Ms. Doe was fit for duty as defined under 5 C.F.R. 339.101 *et. seq*. and the Rehabilitation Act of 1973, as amended.

14. DIA has maintained and continues to maintain a record of Ms. Doe's condition, diagnosis, and treatment plan.

15. There has been no change in Ms. Doe's diagnosis or treatment plan since the DIA found her fit for duty. The DIA has had no reason to question or investigate, nor has it questioned or investigated, Ms. Doe's fitness for duty since 2004, until the acts and omissions giving rise to this Complaint.

16. Between 2005-2008, with actual knowledge that Ms. Doe is an individual with a disability, the DIA permitted Ms. Doe to deploy abroad to Middle Eastern nations and elsewhere.

17. In 2009, however, despite any lack of conduct, performance or other event that would raise a legitimate concern for the safety of Ms. Doe or others, or any concern that Ms. Doe could perform her job, the DIA, nevertheless, took an adverse action against Ms. Doe based solely and exclusively on her actual or perceived disability status, or record thereof.

18. On or about March, 2009, the DIA informed Ms. Doe that she was scheduled to be placed on TDY (temporary duty deployment) to Dubai, United Arab Emirates, commencing in April, 2009, in connection with her employment.

19. The purpose of the TDY was to attend a conference on behalf of the United States.

20. The UAE is a modern nation with advanced medical care. For example, the American Hospital of Dubai boasts: "The hospital is a state of the art facility equipped with the latest equipment. Our Physicians are all North American Board Certified or of equivalent, supported by western trained Nurses and support staff." *See* American Hospital of Dubai website. The country has the world's only seven star hotel and is a banking and commercial center, as well as a safe haven and point of travel for American tourists, in an otherwise troubled Middle East.

21. According to DIA procedure, on or about April 1, 2009, Ms. Doe submitted to pre-deployment evaluation at the Defense Logistics Operation Center ("DLOC"), a division of DIA.

22. Subsequently, and apparently without reference to the limits or standards of the Rehabilitation Act, a DLOC physician requested medical information from Ms. Doe for reasons

that remain unclear. Ms. Doe received none of the warnings or protections regarding the collection or use of the medical information or any right to protest its collection or use, contrary to law.

23. In response to this directive, Ms. Doe obtained a letter from her treating psychiatrist, dated April 6, 2009, which cleared her for full duty, without restriction.

24. On April 7, 2009, Ms. Doe received notice that DLOC had found her "not deployable" solely because she had a past diagnosis of bipolar affective disorder.

25. At the time of this denial, Ms. Doe's bipolar disorder was not exhibiting or manifesting itself either in the workplace or at home and she was scrupulously compliant with her treatment regimen and reporting requirements to the DIA.

26. When Ms. Doe protested the denial, the DLOC informed her that, pursuant to a policy of the DOD component CENTCOM, *mere diagnosis of bipolar disorder automatically disqualifies deployment*. The DLOC contended that CENTCOM policy governed and stated (incorrectly, as it would turn out) that CENTCOM policy made bipolar disorder, whether in remission or under treatment, a *per se* impediment to deployment for any length of time in any area under CENTCOM jurisdiction.

27. DLOC based its claim on the following statement in CENTCOM policy: "Psychotic and bipolar disorders are disqualifying for deployment." *See* "Amplification of the Minimal Standards of Fitness for Deployment to the CENTCOM AOR," Tab A of the "U.S. Central Command Individual Protection and Individual Deployment Policy (MOD 9)," as well as

the "Policy Guidance for Deployment-limiting Psychiatric Conditions and Medications," dated Nov. 7, 2006, Section 4.1.4.1).

28. DLOC attempted no accommodation to Ms. Doe, reasonable or otherwise, and simply reflexively stated that her mental health diagnosis was a bar to the particular benefit of employment she sought. At no time did DLOC seek or obtain any tangible medical analysis to support its claim that Ms. Doe's mere diagnosis of bipolar disorder presented any threat, direct or otherwise, to Ms. Doe's safety or the safety of others, nor did it claim that the condition had any impact on the ability of Ms. Doe to perform the essential functions of her position in any way.

29. The effect and imposition of the CENTCOM policy to Ms. Doe openly and expressly discriminated against her, as well as other similarly-situated employees as a class, solely on the basis of their medical condition and actual or perceived mental impairment, or record thereof.

30. Further, DIA failed to make any inquiry into Ms. Doe's individual condition or the nature of her proposed deployment. Instead, it regurgitated the CENTCOM policy as gospel and made no effort to make an individualized assessment as to whether Ms. Doe's condition was a legitimate basis for the denial of her deployment.

31. In April, 2009, Ms. Doe attempted to address the matter informally and, acting *pro se*, submitted an appeal through her chain of command. That appeal was denied based solely on her diagnosis.

32. On or about April 14, 2009, Ms. Doe also submitted a Medical Waiver Request, which would have allowed Ms. Doe to deploy despite the initial finding of "not deployable" based on her individual condition and the nature of her particular anticipated deployment.

33. The DIA denied Ms. Doe's request for waiver solely because of her diagnosis.

34. Again, the DIA failed to make any inquiry into Ms. Doe's individual condition or the nature of her proposed deployment before it denied her request for waiver.

35. Ms. Doe also suggested reasonable accommodations as part of an attempted interactive dialogue with the DIA. For example, Ms. Doe proposed that the DIA grant Ms. Doe a waiver to deploy based on her individual facts and circumstances. Ms. Doe also proposed that the DIA distinguish between CENTCOM countries based on level of threat; engage in a country-by-country analysis based on available medical resources; categorize different types of deployment; or impose fewer conditions that automatically render an individual "not deployable" and permit, instead, more individualized inquiry into an individual's fitness for both duty and deployment.

36. Ms. Doe also suggested that she be permitted to travel at least to those countries where the DIA's unstated concerns could be addressed. She also suggested that she would accept shorter deployments; and/or pay her own medical expenses, if needed, in deployed locations.

37. The DIA failed to consider any of Ms. Doe's suggested accommodations.

38. The DIA failed to consider or propose any accommodations of its own.

39. The DIA failed to engage in any discussion of accommodations with Ms. Doe.

40. Between May 13, 2009-June 30, 2009, Ms. Doe participated in the DIA Equal Opportunity Office informal complaint process.

41. The DIA refused to participate in alternative dispute resolution.

42. On July 13, 2009, Ms. Doe filed a Formal Complaint of Discrimination with the DIA's Equal Opportunity Office.

43. No investigation of any kind was done in either the informal or formal complaint process. Reflexively relying on CENTCOM's policy, the DIA on September 11, 2009, issued a Notice of Dismissal of Ms. Doe's claim.

44. On September 16, 2009, Ms. Doe received the Notice of Dismissal, which cited the CENTCOM policy as sacrosanct and not subject to "collateral attack" (although CENTCOM and DIA are both part of the Department of Defense).

45. On or about early October, 2009, Ms. Doe was promoted.

46. Further promotions and opportunities to gain expertise, however, could and would be affected by the lack of her ability to travel. In addition, Ms. Doe has now had to broadly disclose her condition in order to seek accommodations for her diagnosis and to challenge the policy that rather publicly denied her deployment.

47. Ms. Doe remains classified as "not deployable."

48. Ms. Doe was not able to attend the conference in the UAE in April, 2009, solely because DIA had determined she was "not deployable" based on her diagnosis of bipolar disorder.

49. Based on the DIA's finding of "not deployable," Ms. Doe will not be able to deploy in the future when other opportunities can and will arise in connection with her employment.

50. Because Ms. Doe will not be able to deploy in the future, she will not be able to participate in any work-related experiences abroad.

51. In order to be considered for advancement to senior positions, better assignments and professional development, however, it is essential that Ms. Doe travel to locations of interest and/or where conferences are held.

52. Failure to participate in work-related travel abroad has and will have an adverse impact on Ms. Doe's performance and appraisal.

**Count I**
**(Violation of the Rehabilitation Act – Disparate Treatment)**

53. Ms. Doe incorporates by reference Paragraphs 1 through 52 above, as though fully set forth herein.

54. The DOD, and its components, are federal employers subject to the Act.

55. As a result of Ms. Doe's diagnosis of bipolar disorder, Ms. Doe has had, does have, and/or is perceived as having a physical or mental impairment that substantially limits one or more life activities.

56. Ms. Doe is an individual with a disability within the meaning of the Rehabilitation Act, as amended, because she has an actual disability, has a record of a disability; and/or is perceived as having a disability.

57. Ms. Doe is qualified, with or without accommodation, to perform the essential functions of her position(s) within the DIA.

58. Ms. Doe has suffered an adverse employment action, or actions, based solely on the fact that she is an individual with a disability.

59. Defendants discriminated against Ms. Doe based solely on her disability when they knowingly and intentionally refused to permit her to deploy because of her disability.

60. Defendants discriminated against Ms. Doe based solely on her disability when they knowingly and intentionally relied on and applied against Ms. Doe the CENTCOM policy that reflects a blanket policy of discriminating against individuals with bipolar disorder. This CENTCOM policy is discriminatory on its face.

**Count II**
**(Violation of the Rehabilitation Act – Disparate Impact)**

61. Ms. Doe incorporates by reference Paragraphs 1 through 60 above, as though fully set forth herein.

62. Defendants discriminated against Ms. Doe when they imposed facially neutral policies, neutral in intent, to discriminatory effect against Ms. Doe solely because she is an individual with a disability.

63. With respect to Ms. Doe, these policies are not job-related.

64. With respect to Ms. Doe, these policies are not justified or justifiable as business necessity.

65. These policies did not actually require the discriminatory action.

**Count III**
**(Violation of the Rehabilitation Act – Failure To Make Reasonable Accommodations)**

66. Ms. Doe incorporates by reference Paragraphs 1 through 65 above, as though fully set forth herein.

67. Ms. Doe proposed numerous accommodations.

68. These or other accommodations are reasonable, would address any legitimate reservations held by Defendants with respect to Ms. Doe's fitness to deploy, and would not impose an undue hardship for Defendants.

69. Defendants failed to make any reasonable accommodations.

**Count IV**
**(Declaratory Relief – Discrimination Per Se)**

70. Ms. Doe incorporates by reference Paragraphs 1 through 69 above, as though fully set forth herein.

71. CENTCOM policy and the DIA's application to Ms. Doe was and is discrimination *per se* and the policy was and is facially invalid.

72. The policy specifically prohibits an entire class of individuals from engaging in the terms and benefits of their employment simply because they have been diagnosed with a

mental health condition. On its face, the policy discriminates against a class specifically protected by the Rehabilitation Act.

73. The policy contains no exceptions, no waivers, and no forms of accommodation.

74. Declaratory judgment is appropriate since the discriminatory nature of the policy is evident from merely reading it. Discriminatory policy such as that employed by the DOD reflects policy that the Rehabilitation Act was designed specifically to prohibit. The lack of an individualized assessment, or any reference to qualified medical evidence, renders a policy, such as the one imposed here, inherently illegal.

75. The Rehabilitation Act's language and purpose, which incorporates similar Congressional intent expressed in the Americans with Disabilities Act ("ADA"), was to ensure that persons with physical and mental disabilities would not be subject to discriminatory policies that limited their employment, even when those policies paternalistically attempt to protect the individuals with the impairments.

76. The employer, particularly federal employers, must establish legitimate business reasons based on particular assessments and credible, competent medical information, to withhold a specific term, condition, or benefit of employment.

77. To allow an agency to simply exclude persons in the manner in which Ms. Doe was excluded is to segregate and demonize individuals who have had a diagnosis of a medical condition.

78. This Court is empowered through the Declaratory Judgment Act to look at the four corners of the policies and render an opinion as to their invalidity.

79. In this case, the CENTCOM policy is discriminatory on its face.

**Count V**
**(Violation of Rehabilitation Act – Unlawful Use of Confidential Medical Information)**

80. Ms. Doe incorporates by reference Paragraphs 1 through 79 above, as though fully set forth herein.

81. The manner and method in which the DIA collected, distributed, and used Ms. Doe's confidential medical information violated the confidentiality provisions of the Rehabilitation Act, as amended (which incorporates the confidentiality provisions of the ADA).

82. The DIA failed to use the medical information to determine whether Ms. Doe was capable of performing the tasks of overseas travel.

83. More importantly, assuming the DIA's policy was ever appropriate, the DIA failed to use the information to make an individualized assessment of whether that policy as applied to Ms. Doe was appropriate.

84. On information and belief, the DIA gathered, requested, and disseminated confidential information for a purpose other than determining whether Ms. Doe could be reasonably accommodated.

85. As such, the DIA has violated the Rehabilitation Act's prohibition on the collection and use of medical information.

**Count VI**
**(Violation of Rehabilitation Act – Impermissible Medical Inquiry)**

86. Ms. Doe incorporates by reference Paragraphs 1 through 85 above, as though fully set forth herein.

87. Through prior inquiry, the DIA had determined that Ms. Doe was fit for duty and could perform all essential functions of her job, with or without accommodations. Ms. Doe received security clearance after providing officials with all relevant medical documents concerning her condition and its treatment. The DIA determined that a revocation of Ms. Doe's security clearance based on her medical or mental health was inappropriate. This action was the functional equivalent of a fitness for duty evaluation pursuant to 5 C.F.R. § 339.101 *et seq.*

88. Having been cleared for duty, further inquiry into her medical or mental health amounted to an impermissible post-employment psychiatric evaluation.

89. Moreover, there was no new basis for the DIA to make new and further inquiry into Ms. Doe's mental health barring a showing by the DIA that her mental illness was manifesting itself in the workplace. In essence, the DIA simply demanded that Ms. Doe obtain a psychiatric opinion on her ability to perform her job where no evidence, based on conduct or performance, existed at the time of the inquiry to establish its necessity.

90. The DIA engaged in an impermissible medical inquiry in violation of the Rehabilitation Act, as amended.

**Count VII**
**(Declaratory Relief – Failure to Implement Policies)**

91. Ms. Doe incorporates by reference Paragraphs 1 through 90 above, as though fully set forth herein.

92. Even assuming all applicable policies are facially valid, the DIA failed to implement the policies appropriately, violating their terms in the manner in which it denied the terms, conditions, and opportunities attendant to Ms. Doe's employment.

93. It interpreted all applicable policies to prohibit deployment *per se*; to require a *per se* denial of Ms. Doe's Request for Waiver; to require a *per se* denial of her informal appeal through her chain of command; and to require a *per se* denial of any consideration or implementation of reasonable accommodations.

94. These denials amount to a failure of the DIA to provide the accommodations that CENTCOM lists in its policies.

95. In essence, the DIA ignored all accommodations, even those set forth by CENTCOM.

96. Thus, the application of the policies was not only an act of outright denial of accommodations but a denial of reasonable accommodations as well.

97. In addition, there was no legitimate reason for the denials because the DIA misinterpreted the policies on which it relied in making those denials.

98. The DIA failed to implement all applicable policies.

## Prayer For Relief

99. Plaintiff requests that the Court issue a writ of mandamus directing the DOD to vitiate the policies referenced herein since such policies are discriminatory on their face.

100. Plaintiff also requests that this Court enjoin DOD from further applying these policies to individuals with physical or mental impairments unless the DOD can establish a legitimate business necessity for denying deployment opportunities on a case-by-case basis.

101. Plaintiff also requests that she receives compensatory damages and pain and suffering in an amount up to, and including, the statutory maximum for each and every count cited.

102. Plaintiff requests that she be allowed to deploy overseas and that her performance reviews and promotional opportunities are not restricted or impaired by the DIA's denial of deployment in this case or knowledge of her mental health condition.

103. Plaintiff requests that the Court order the DOD to expunge all records pertaining to the denial of her request to deploy, her EEO file, and any medical records provided by Plaintiff with respect to her request for either travel or an exemption from the policies, as well as any and all record of informal appeals and this lawsuit.

104. Plaintiff further requests that the DOD determine whether any employee in the past five years has been denied deployment, based on the application of the policies.

105. Finally, Plaintiff requests attorneys' fees and costs, and such other and further relief as may be available to the Plaintiff and afforded by this Court.

DATED: December 9, 2009

Respectfully Submitted,

Kevin E. Byrnes (DC Bar No. 480195)
SCHNADER HARRISON SEGAL & LEWIS LLP
750 Ninth Street, NW, Suite 550
Washington, DC 20001
Telephone: (202) 419-4200
Facsimile: (202) 419-3454
kbyrnes@schnader.com

PHDATA 3257541_1